## The Citizens' Insurance Co. *versus* McLaughlin.

1. A policy of insurance on a patent leather manufactory allowed keeping benzole in no place but in a shed detached from the building; the insured in conducting their business used benzole and carried it as needed into the factory in an open can. *Held*, not to be a breach of the conditions of the insurance.

2. Benzole being ordinarily used in such manufacture, the presumption was that it was intended that it might be used as it is ordinarily used in similar factories.

3. In a policy on a "tannery and patent leather manufactory," it must be intended that there was included whatever, not expressly excepted, is necessary and essential in conducting such a business.

4. A witness familiar with the mode of using benzole in such factories in Newark, was asked as to the mode, &c., of using benzole in the factories with which he was acquainted. *Held*, that the question was proper.

ERROR to the District Court of *Allegheny county*.

The action was covenant on a policy of insurance in which John Y. McLaughlin and Richard T. Leech, trading as J. Y. McLaughlin & Co., were plaintiffs, and The Citizens' Insurance Company were defendants. The writ was issued to July Term 1865.

On the 13th of April 1864 the defendants issued a policy of insurance to the plaintiffs "upon the buildings of their tannery and patent leather manufactory, including bark shed and bark contained therein (except oil shed on the rear end of their lot)," and certain specified contents of the building;—the aggregate amount insured was $5000.

The policy contained the following provisions:—

"It is a condition of this policy that there will be no fire in any of the above described buildings, except under the boilers.

"Privilege granted for keeping not more than five barrels of benzole in a small shed entirely detached from all the other buildings, situated on the rear end of their lot, about one hundred feet from the main building, and nowhere else on said premises.

"If the premises above mentioned shall, at any time when such fire shall happen, be, in whole or in part, occupied for purposes considered hazardous, in the printed proposals and conditions hereunto annexed, unless liberty so to occupy them be expressly stipulated for, this policy, and every clause, article and thing herein contained, shall be void and of no effect.

"In the insurance of goods, wares or merchandise, the building or place in which the same are deposited, is to be described; also, whether such goods are of the kind denominated hazardous, and whether any manufactory is carried on in the premises. And if any person shall insure his or their building or goods, and shall cause the same to be described in the policy or in any description

or plan referred to therein, otherwise than as they really are, so that the risk offered shall thereby be underrated, such insurance shall be of no force."

Amongst the " hazardous" risks mentioned in the enumeration attached to the policy are " factories, oils and varnish, boilers of paint, &c." The business of the plaintiffs is not one of those enumerated specifically.

The benzole was in the shed as stipulated.

In making varnish for japanning the leather, manufacturers use benzole mixed with linseed oil, forming a composition called " sweet meat," which is spread on the hides ; it is applied in the room where the hides are first coated. The composition is put into a can of 40 to 60 gallons. The second coatings of the composition, by reason of the evaporation of the benzole from the heat of the room, have to be " thinned down" from time to time by benzole. The supply is taken into the room in cans or buckets containing about five gallons and is poured out from them or buckets.

On the 2d of February 1865, a japanner in the employ of the plaintiffs, brought three or four gallons of benzole from the benzole shed, in an open tin bucket and carried it into one of the japanning-rooms. He was just then requested by another of the hands to get him some lampblack : he set the bucket down in the centre of the floor of the japanning-room and turned away to go to the door, when from some cause not ascertained, the benzole immediately took fire and the building and contents were burned.

The suit was brought to recover for this loss.

On the trial before Williams, A. J., a witness having stated that he knew the way benzole was used in twelve establishments in Newark, N. J., was asked by plaintiffs to state " how it is used, in what vessels and how applied in the establishments with which you are acquainted ?"

The question was objected to by the defendants but allowed by the court, and an exception taken.

The defendants submitted a number of points, involving the one question whether carrying the benzole into the factory and using it there, as the case showed, were a breach of the conditions of the insurance.

The judge, after stating the evidence, charged :—

" The benzole, if not the proximate, was the remote or indirect cause of the fire ; and the defendant contends that the fire would not have occurred as it did, if the benzole had not been brought into the japannery, as it was, in an open bucket; and that the bringing of the benzole into the japannery in the way it was done by the plaintiffs' servant, with their knowledge that such was his habit, was such a clear and. direct breach of the terms and condition of the policy, as will prevent them from maintaining this

action, and recovering the amount insured by the said policy. But did the plaintiffs violate the provisions of the policy, and were they guilty of a breach of their duty under the contract, in carrying benzole into the japanning-room, and using it for the purpose and in the manner they did? The evidence shows that they used it in the same way and for the very same purpose that it is used in all tanneries of the kind in this and in other states. Formerly spirits of turpentine were used in making the composition called ' sweet meat,' and the varnish used in the manufacture of patent leather. And spirits of turpentine were also used to thin or reduce the sweet meat and varnish, so as to fit them for use. But within the last four or five years benzole has been substituted in the place of turpentine, and has been found to answer the same purpose as turpentine in the manufacture of patent leather. It was used by the plaintiffs for this purpose when the contract of insurance was made; and the evidence on both sides shows that they used it precisely in the same way that it is used in other tanneries and establishments of the same kind,—those that have been carried on here and elsewhere. The officers of the company knew, or ought to have known when they took the insurance, what articles were used by the plaintiffs in their tannery in the manufacture of patent leather.

" They must be supposed to know that it was carried on in the usual and customary way; and if it was usual and customary to employ benzole in the manufacture of such leather, they must be presumed to have known the fact and to have contracted with reference thereto. Besides, if they were ignorant of the process, and did not know what articles were actually used by the plaintiffs in the manufacture of their leather, ' the privilege of keeping not more than five barrels of benzole, in a small shed entirely detached from the other buildings,' ought to have put them on inquiry. Why should the privilege be asked for and granted if benzole was not to be used in the tannery, and if not necessary and essential in the process of making patent leather? If the officers of the company did not know that benzole was used by the plaintiffs in making and reducing the composition and varnish employed in the manufacture of their leather, it was their own fault; and if they did know the fact, they ought not to complain or attempt to evade the responsibility of their contract because the loss has happened in consequence of the plaintiffs using benzole in the usual and ordinary way that it is used in such tanneries as theirs. So far from the plaintiffs being liable to the charge of misconduct, which, in its legal signification, means a transgression of some established and definite rule of action or law (Citizens' Ins. Co. *v.* Marsh, 5 Wright 364–5), they were not even guilty of negligence or carelessness in using the benzole, if they used it in the same manner and for the same purpose that it is customarily

and uniformly used in other establishments and tanneries of the same kind. If one does anything, or uses any article of a hazardous nature for the same purpose and precisely in the same way that everybody else does, be cannot be regarded as negligent or wanting in skill. Besides, the mere fault or negligence of the assured and his servants is no defence to an action on the policy to recover for a loss, for it has been repeatedly ruled, and it is too well settled to be doubted, that a loss by fire, occasioned by the mere fault or negligence of the assured, by his servants or agents, without fraud or design, is a loss within the policy for which the insurers are liable. If, therefore, the jury find from the evidence that the benzole in the open bucket in the japanning-room was the indirect and remote cause of the fire, without which the loss would not have happened, the defendant, under the terms and conditions of the policy, is responsible therefor, if the jury find that benzole was commonly and ordinarily used at the date of the policy and at the time of the loss, in the process of manufacturing patent leather in other tanneries of the same kind as the plaintiffs', and that they used it for the same purpose and in the same way in making and reducing their composition and varnish, as it is customarily and uniformly used in other establishments of a like kind. The defence set up and relied on here would prevent the plaintiffs from using their tannery for the manufacture of patent leather ; for the testimony of the chemist called by the defendant shows that the composition used in the manufacture of the leather, composed of linseed oil and benzole, ignites as readily and burns as freely as benzole itself."

There was a verdict, November 11th 1865, for the plaintiffs for $5185.75, and the defendants took a writ of error.

The errors assigned were the admission of the evidence objected to and the charge of the court.

*R. & S. Wood*, for plaintiffs in error, cited Frisbie *v.* Fayette Mutual Ins. Co., 3 Casey 325 ; Swete *v.* Fairlie, 6 Car. & P. 1 (25 E. C. L. R.) ; 20 Maine 125 ; 2 Robinson La. 266 ; Girard F. and M. Ins. Co., 1 Wright 298 ; 5 Hill 10.

*J. Veech & Son*, for defendants in error, cited Jeff. Ins. Co. *v.* Cotheal, 7 Wend. 72 ; Wall *v.* Howard Ins. Co., 14 Barb. 383 ; Bryant *v.* Poughkeepsie M. Ins. Co., 21 Id. 154 ; 1 Phillips on Ins., § 125 ; Harper *v.* The City Ins. Co., 1 Bos. 520 ; 22 N. Y. Rep. 441 ; Same *v.* Albany M. Ins. Co., 17 N. Y. Rep. 194 ; 8 Conn. 459 ; 6 Wend. 623.

The opinion of the court was delivered, January 7th 1867, by
WOODWARD, C. J.—Assuming that the fire originated from the use of benzole in the patent leather manufactory, the material

question was whether the use of that article was a violation of the conditions of the policy. The policy granted the " privilege of keeping not more than five barrels of benzole in a small shed entirely detached from all the other buildings, situated on the rear end of the lot, about 100 feet from the main building, and nowhere else on said premises." But the shed containing the benzole was expressly excepted out of the policy.

The custom of the workmen was to carry an open bucket of benzole into the factory as often as wanted to be used in reducing, the composition called " sweet meat," an article that was used in the manufacture of patent leather, and on the morning of the fire one of them had carried in a bucket containing three or four gallons of benzole, which he set down in the middle of the room and turned to the door, when it took fire, from some unknown cause, and communicated the flames to the building, which was wholly consumed.

The argument on behalf of the company is, that the policy both in letter and spirit meant to confine the benzole to the shed on the rear of the lot, and to exclude it from any other part of the premises—that carrying it from the shed in open buckets across the yard, and setting it down in a room with the door open, was an abuse of the privilege granted by the company, which, if it could have been anticipated, would have prevented their taking the risk—that such use of it was *keeping* it elsewhere than in the shed, and was therefore a palpable violation of the covenant.

The answer which the learned judge made to this argument was substantially as follows: You insured a patent leather manufactory—you knew, for you were bound to know, that benzole was ordinarily used in such factories; you stipulated that five barrels of it might be kept on hand near to the factory; and the necessary presumption is that you meant it might be kept for use in that factory as the article is ordinarily used in similar factories. If, therefore, it was kept in the place stipulated, and used according to the custom of the trade, it was one of the risks covered by the policy. The jury found the fact that the mode of using it was according to custom, and so recovery was had.

It appears to us that the argument was well answered. This business is not enumerated in the list of hazardous risks, and the company could not have expected it to be suspended, nor to be carried on in any other than the customary modes. They insured it. They took the risk, after having their attention drawn to the dangerous article, and after excluding it, *as stored in bulk*, from the policy. But did they mean to exclude it from the factory as an element or agent in the conduct of the business ? To assume that they did, in the absence of language to that effect, would be to assume that they expected the business to stop, or to be carried on out of the usual mode. The words of the policy descriptive

of the subject-matter of the insurance, are, " the buildings of their tannery and patent leather manufactory," and it must be intended that these words included whatever, not expressly excepted, was necessary and essential in conducting such a business.   In the case of Harper *v.* The City Insurance Company, 1 Bosworth N. Y. Rep. 520, this was the doctrine applied to a printing establishment, where the fire originated from the use of camphene, which was one of the hazardous articles enumerated by the policy, but it appeared that camphene was ordinarily used by printers for cleaning their types and plates, and was so used in that instance. On this ground it was treated as one of the risks covered by the policy.   See also Girard Fire Insurance Company *v.* Stephenson, 1 Wright 298.

We think there was no error in the admission of the testimony of F. J. Harden.   He gave an intelligible account of the mode of using benzole in twelve factories at Newark, New Jersey, and said it was brought in and used from cans and buckets.   If any other custom had been established at Pittsburgh it could have been shown, but in the absence of all other evidence on the subject this was competent to fix the usage of the business.

The judgment is affirmed.

THOMPSON, J., dissented.

STRONG, J., did not sit at the argument.